# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| MICHAEL ABBATE, individually and on behalf of all others similarly situated, | Case No.   2:20-cv-3196 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| VERDE ENERGY USA OHIO, LLC, | |
| Defendant. | |

Plaintiff Michael Abbate ("Plaintiff"), by and through his undersigned counsel, on behalf of himself and all other persons similarly situated, brings this Class Action Complaint against Verde Energy USA Ohio, LLC ("Verde" or "Defendant"), and alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief based upon, *inter alia*, investigations conducted by his attorneys.

## INTRODUCTION

1. This action is brought as a class action on behalf of Plaintiff and a putative class of Ohio consumers seeking redress for the deceptive and bad faith pricing practices of Defendant that have caused at least tens of thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2. Verde, a Certified Retail Electric Supplier or "CRES," has exploited the deregulation of the retail electricity market by luring consumers into switching electricity suppliers using a bait-and-switch scheme designed to deceive reasonable consumers.  Verde lures its customers into switching to its electricity supply services by offering, for a limited period of time, teaser rates that are initially lower than the local Electric Distribution Companies' (EDC's) rates

and other competing Certified Retail Electric Suppliers' ("CRESs") rates for electricity. Once the initial rate expires, however, Verde automatically switches its customers over to its Variable Rate. Verde represents that its Variable Rate each month is based on "market conditions." A reasonable consumer thus expects that after the teaser rate expires, he or she will pay a Variable Rate that reflects (or correlates with) the wholesale cost of electricity and local competitors' rates — the two primary components of any energy market.

3.      Despite its explicit representations that customers would receive low cost power (including reinforcement of that misrepresentation through its website address, www.lowcostpower.com and Welcome Letters stating, "We look forward to providing you with 100% renewable energy at a *very competitive rate and immediate savings*…") (emphasis added), the rates Verde charges its customers are not low cost, but are instead substantially higher than the rates of its competitors (i.e., the local distribution companies and CRESs); the rates are invariably higher than Verde's own initial teaser rates; and the rates are wholly disconnected from wholesale electricity market pricing. In short, nothing indicates that Verde's Variable Rates rise and fall with any discernable indicator of "market conditions."

4.      Indeed, as set forth below, Verde routinely charges its consumers significantly more than *two times* the underlying market rate, notwithstanding Verde's representations that the customer will receive electricity from Verde at a Variable Rate, and that its Variable Rates "change" monthly with market conditions. Specifically, even when the market price goes down, Verde's rates do not decrease, but instead remain at an extraordinarily high premium rate for electricity *regardless* of fluctuations in the underlying market price.

5.      Verde makes additional representations that it offers "low-cost," "very competitive" electric rates, and "cost effective" power. But what Verde does not inform customers

is that its Variable Rate is virtually always substantially higher than, and not competitive with, other rates available in the market and is significantly higher than the rates available through EDCs.

6.      Verde's unfair and deceptive scheme of charging inflated electric prices that sometimes match *increases* in the underlying market price while failing to pass along corresponding *decreases* is intentionally designed to maximize revenue for Verde.  Consumers, such as Plaintiff and the Class, were deceived into believing that Verde would provide market-based rates when, in reality, Verde sets its prices at significantly above-market rates that do not correlate with market conditions.

7.      No reasonable consumer would interpret or understand Verde's pricing representations as granting Verde unfettered discretion to raise its Variable Rate as high as it pleases in order to maximize profits, such that the Variable Rate bears no resemblance to electricity market pricing.  Further, no reasonable consumer would knowingly agree to pay higher power rates than what were previously being paid without additional services or enhancements, which are not provided by Verde.  Indeed, any contrary interpretation would render the contract's variable rate pricing terms meaningless.

8.      As a result of Verde's unfair and deceptive overcharging scheme, Ohio consumers are being fleeced millions of dollars in exorbitant charges for electricity.

9.      Plaintiff, on behalf of the class he seeks to represent, brings this lawsuit based on Verde's unlawful and unconscionable consumer practices under the Ohio Consumer Sales Practices Act, R.C. 1345.02, *et. seq*., as well as Verde's breach of contract and breach of the implied covenant of good faith and fair dealing, and alternatively, for unjust enrichment.  Through its deceptive and unconscionable practices, upon information and belief, Verde bilked the class of tens of thousands of current and former customers with Variable Rate electricity plans out of

millions of dollars. Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, statutory damages, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

10.     Plaintiff Michael Abbate is a resident and citizen of Columbus, Ohio.

11.     Defendant Verde Energy USA Ohio, LLC is a corporation organized under the laws of the State of Texas whose principal place of business is located at 12140 Wickchester Lane, Suite 100, Houston, Texas 77079-1211.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class (the "Class Members" or "Class") are citizens of States different from Defendant.

13.     This Court has general personal jurisdiction over Defendant. Defendant does business in Ohio through continuous, permanent, and substantial activity in Ohio.

14.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Ohio consumers.

15.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.     Energy Deregulation and the Role of Certified Retail Electric Suppliers**

4

16.     In the late 1990s and early 2000s, many states moved to deregulate parts of the electricity supply services performed by large public utilities. Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer. The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants. However, the regulated utilities continued distributing power from these power plants to consumers through transmission lines. One of the primary goals of deregulation was increased competition in the industry, with a focus on achieving greater consumer choice and reduced energy rates.

17.     In an energy deregulation state like Ohio, the utility company is not allowed to profit from buying or selling energy. Whatever the energy costs the utility company to produce or procure is what they may charge the customer. They can profit only from the delivery. They own the wires the energy is sent through and get paid for the delivery of the energy no matter where it comes from. Of course, utilities still must cover for ordinary operating expenses, such as rent, payroll, supplies, marketing, and overhead. Thus, local utilities cannot simply buy electricity at the wholesale market rate and sell it to their customers at that same rate.

18.     In contrast, CRESs can profit from buying and selling energy to customers, because they are not subject to the same regulations as utility companies. Thus, deregulation enables energy customers to shop for electric services by separating the supply and delivery portion of these services, and opening up the supply portion to competition from CRESs. This supposedly enables consumers to shop around for the best price on their energy supplies and in turn, save money on their energy bills.

19.     In deregulation states, CRESs may compete to supply the energy services, but the local electric companies continue to deliver power through their wires regardless of which

5

company supplies them. In addition, the local public utility may continue to supply metering, billing, and related administrative services to the consumer, regardless of who supplies the energy services. Thus, the public utility continues to generate and send periodic bills directly to the consumer for the energy it supplies, even after a consumer has enrolled in or "switched" to a CRES. The fact that the energy services for which the customer is being billed are now being provided by a CRES is noted on the bill, is easily overlooked. The bill otherwise looks substantially the same as it did before the switch.

20.    Although deregulation may increase competition for energy supply services, because there is no regulatory authority over the prices that CRESs charge their customers, these unregulated suppliers are not required to purchase long-term energy contracts, as required of local utility companies, that would help insulate residential customers from sharp price fluctuations.

21.    Because the prices they charge their customers are not regulated, CRESs often choose to offer variable rate contracts, giving them the ability to change their rates to meet market conditions. When market conditions cooperate, a CRES is able to offer potential customers significant cost savings in order to lure them into entering into a contract.

**B.    The History of Ohio's Energy Industry**

22.    In 1999, Ohio deregulated the market for electricity supply, a major break with past policy. In July 1999, Ohio restructured its energy market with Senate Bill 3 (SB3) to give consumers choice with their energy provider. The law took effect on January 1, 2001.

23.    Even after deregulation, the EDCs continue to distribute energy to all customers whether they have switched to a CRES or not.

24.    Deregulation allows Ohio consumers to shop for a variety of offers, including fixed- and variable-rate plans, with different durations and contract terms. The theory was that

6

competition would result in CRESs being more aggressive than the utilities in reducing wholesale purchasing costs and thereby lower retail residential rates.

25.     The market for wholesale electricity in Ohio is under the administration of an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called PJM Interconnection LLC ("PJM").

26.     PJM coordinates and directs the generation and flow of electricity throughout its regions, including Ohio, ensuring that electric supply exactly meets demand throughout the network.

27.     PJM manages the market and determines where and when electricity will be made by generation companies and the wholesale prices that will be paid for that electricity through competitive bids.

28.     CRESs such as Verde have various options to buy electricity at wholesale for resale to retail customers in Ohio, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing electricity in advance of the time it is used by consumers, either by purchasing electricity to be used in the future or by purchasing futures and forward contracts for the delivery of electricity in the future at a predetermined price. The point of deregulation is to allow CRESs to use these and other innovative purchasing strategies to reduce electricity costs.

29.     If a customer switches to a CRES, his or her energy will be "supplied" by the CRES, but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

30. As part of the deregulation plan, CRESs' (like Verde) rates, or the method by which they set those rates, are not regulated by the Ohio Public Utilities Commission ("PUCO").

31. Verde's prices are not approved by the PUCO. Rather, Verde and other CRESs set their own rates for supplying energy to consumers. And Verde, like all other suppliers, relies upon the local utilities to deliver the energy it purchases on the wholesale market to its customers.

32. However, CRESs, such as Verde do not have unfettered discretion to set their rates as they please in any manner they wish. Instead, Verde was obligated to follow—but instead violated—Ohio's Administrative Code § 4901:1-21-05(A)(3), which mandates that Verde's Terms of Service (the "Agreement") provide "a clear and understandable explanation of the factors that will cause the price to vary, including any related indices, and how often the price can change." *Id*. This provision is designed to protect customers from precisely the type of predatory behavior in which Verde indulges but cannot justify.

33. Simply put, only one clause in Verde's Agreement describes the basis of its variable rate, and it states that "Verde will supply electricity to Customer at a 100% renewable variable generation rate that may change monthly with market conditions." Verde's Terms and Conditions of Service are attached hereto as **Exhibit A**.

**C. The Failure of Energy Deregulation and Resulting Harm to Consumers**

34. Almost all states that deregulated their energy markets did so in the mid- to late-1990s. This wave of deregulation was frantically pushed by then-corporate behemoth Enron. For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling, said:

Every day we delay [deregulation], we're costing consumers a lot of money . . . . It can be done quickly. The key is to get the legislation done fast.[1]

35. Changing the industry under this sense of urgency and with inadequate protections against abuse resulted in serious harm to consumers in deregulated states, and has spawned a return to sensible regulation. The number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia, down from forty-two states in 2001 that had started or were considering deregulation. Even some deregulated states have recognized deregulation's potential harm to everyday consumers and now only allow large-scale consumers to shop for their energy supplier.

36. Responding to shocking energy prices often paid by ordinary consumers, many key supporters of deregulation now regret the role they played. For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed. We are not going to give up on re-regulation till it is done."[2]

37. A Connecticut leader who participated in that state's experiment with energy deregulation was similarly regretful:

Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . . If somebody says, no, we didn't screw up, then I don't know what world [they] are living in. We did.[3]

38. An Ohio State University study found that Ohio households have lost at least $1 billion as a result of deregulation.[4]

---

[1] Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT, Jan. 21, 2007.
[2] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.
[3] Keating, supra note 5.
[4] See https://glenn.osu.edu/research/policy/policypapers-attributes/Why-Ohios-retail-electric-deregulation-has-been-bad-for-households.pdf, last accessed June 22, 2020.

9

39.     Verde has been the subject of an investigation into the company's deceptive practices in Ohio.  According to the Defendant's website, Verde has recently agreed to a settlement in a case before PUCO concerning deceptive marketing practices.[5]

40.     Similarly, here, Verde has deceived Ohio residents into enrolling in its electricity plans.  This class action seeks to recover for Ohio residents the amounts above and beyond reasonable market rates that Verde deceived Plaintiff and the Class into paying as a result of the bait and switch scheme.

**D.     Plaintiff's Experience with Verde's Excessive Rates**

41.     Verde engages in a classic bait and switch pricing scheme.  Verde lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates, while leading consumers to believe that the subsequent rates will be less than those offered by their local utilities and other CRESs in the market.

42.     Plaintiff's experience with Verde is typical.  In July 2015, Plaintiff was solicited by Verde by telephone to switch his electricity service from his Distribution Company, American Electric Power Ohio (AEP), with the promises of a lower rate compared to AEP Ohio and promises that he would save money on his electricity bills if he switched.  Based on these promises, Plaintiff made the switch shortly thereafter.

43.     Plaintiff received a Welcome Letter in the mail from Verde, dated July 20, 2015, in which Verde represented that "We look forward to providing you with 100% renewable energy *at a very competitive rate* . . ." (Emphasis added).  The Letter further refers Plaintiff to Verde's website, lowcostpower.com.  Plaintiff's Welcome Letter is attached hereto as **Exhibit B**.[6]

---

[5] *See* https://www.verdeenergy.com/ohio-settlement/, last accessed June 22, 2020.
[6] The Welcome Letter is addressed to "Michael Abote."  Upon information and belief, Verde mis-spelled Plaintiff's last name.  Exhibit B is a true and correct copy of the Welcome Letter that Plaintiff received from Verde.

44.     Based on Verde's promises, Plaintiff and other reasonable consumers understand that Verde's variable rates ("Variable Rate") are "very competitive" with other rates in the market.

45.     Furthermore, Plaintiff was provided with a solicitation in the form of a standard "Terms and Conditions of Service," (the "Agreement") attached hereto as **Exhibit A**.  Verde's Agreement makes this express link between its Variable Rate and the underlying wholesale market rate set by PJM and charged by Generation Companies, stating the Variable Rate "may change monthly with market conditions."

46.     Accordingly, a reasonable consumer would understand that Verde's Variable Rates would be reasonably related to and fluctuate in a manner correlated with the underlying wholesale market rate.  In other words, a reasonable consumer would infer a direct link between the two rates.  Indeed, a reasonable consumer would infer that as the wholesale market rate falls, so will Verde's Variable Rate for retail customers.  There would be no conceivable reason for a consumer to sign up for Verde's energy plan if she did not believe she would receive a better overall deal on her electricity, based on its competitive advantage in obtaining prices in the energy marketplace.

47.     Instead, and contrary to reasonable consumer expectations and the terms of Verde's Agreement, Verde used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level almost *two times* the wholesale market rates when the wholesale prices fell.

48.     In addition to its Welcome Letter, Verde's Terms and Conditions of Service refers to its website: www.lowcostpower.com (*See* **Exhibit A**).

49.     Reading these statements along with the website name, Plaintiff and other consumers reasonably concluded that Verde was offering them "low cost power" at low Variable Rates relative to other prices offered in the market.

50.     The home page of the website contains numerous representations, separate and apart from Verde's Terms and Conditions of Service or any contract with Plaintiff, including representations that Verde provides "cost-effective" and "competitive electricity rates." As such, Plaintiff and a reasonable consumer would understand that Verde provides its customers with "low cost power" and "competitive" rates for electricity.

51.     A screenshot of the home page of Verde's website, www.lowcostpower.com, is shown below. These representations reinforce Verde's promise to provide competitive, low-cost rates to Plaintiff and all Verde customers.



52.     Thus, Verde misleadingly states that its rates are competitive with rates otherwise available in the market by representing that its rates are "competitive" on its website.

53.     The Agreement provided Mr. Abbate with a seven-day recissionary period during which he could rescind the Agreement prior to its commencement should he not agree to its terms. Specifically, the Agreement states that "customers shall have the right to rescind this Agreement within 7 calendar days…"  *See* Exhibit A, § 3.  Thus, during that recissionary period, the Agreement served as a solicitation in which Defendant identified the basis upon which the promised variable rate would be determined.

54.     Based on Verde's representations, Plaintiff decided to switch to Verde for electricity in or around July 2015.  Plaintiff was initially placed on Verde's fixed, teaser rate plan for six months.  He paid 8.99 cents per kWh during this period.

55.     After the six-month teaser period ended, Plaintiff's account was automatically rolled over to Verde's Variable Rate plan.  Plaintiff began paying Verde's Variable Rate in or around January 2016.  However, rather than providing low-cost, competitive electric rates that were tied to wholesale market conditions, Verde charged Plaintiff exorbitant monthly rates that were far higher than competitors' rates and did not vary with wholesale market conditions.

56.     As it is difficult for consumers to determine and compare the rates being charged by Verde versus other CRESs or the local utility companies given that the data is not readily discernable, Plaintiff and other consumers continued to pay exorbitant rates for many months or years after switching to Verde.

57.     Plaintiff overpaid for electricity based on Verde's unfair and deceptive acts and practices.  He would not have enrolled in Verde's plan but for its false representations.  Had Plaintiff known that Verde's rates would be significantly and consistently higher than the wholesale market rate, that the rates would not decrease in line with market rates, or that Verde

would not provide him with a competitive, low cost electric rate, he would not have made the decision to switch from AEP Ohio and enroll in Verde's plan.

58.     Plaintiff paid Verde's Variable Rate until approximately February 2019, after which, upon discovering that Verde was charging exorbitant rates as compared to AEP Ohio, he ended his Verde service and returned to AEP Ohio.  The chart below sets forth (1) the average wholesale price (in cents per kilowatt hour) of electricity delivered to Ohio for each month during the period from July 2018 through January 2019, which is a representative sampling of the time during which Plaintiff was enrolled in Verde's Variable Rate plan, as reported by the PJM; (2) the non-promotional Variable Rates Verde charged Plaintiff for those same months as represented by Verde; and (3) the resulting percentage premium that Verde charged consumers compared to the wholesale rate on a per-month basis.  The chart demonstrates that Verde did not provide Plaintiff with (a) low-cost power; (b) a competitive rate – both, or (c) a rate which decreased in line with market rates—all of which it promised to Plaintiff and other consumers.[7]

| Billing Period[8] | Average Wholesale Price[9] | Verde Price | Verde Premium ABOVE Wholesale Price |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 7/19/2018 | $0.0616 | $0.1149 | 86% |
| 8/17/2018 | $0.0604 | $0.1149 | 90% |
| 9/18/2018 | $0.0635 | $0.1149 | 81% |
| 10/18/2018 | $0.0661 | $0.1249 | 89% |
| 11/16/2018 | $0.0697 | $0.1599 | 130% |
| 12/19/2018 | $0.0621 | $0.1599 | 157% |
| 1/22/2019 | $0.0675 | $0.1599 | 137% |

---

[7] This chart is only a subset of Plaintiff's most recent billing history leading up to his switch back to AEP in January 2019.

[8] The first day of the period is approximately thirty days before.

[9] The Wholesale Market Rate is comprised of the Weighted LMP and Other PJM Charges (i.e., Capacity, Ancillary Services, etc.) and also includes the cost of renewable energy certificates, which is a very small component of the overall costs Verde pays.

59.     There was, accordingly, a huge disparity between the wholesale rates Verde paid for power and the Variable rates that it charged its customers, including Plaintiff and Class Members.

60.     Accordingly, Verde routinely charges Plaintiff and Class Members a Variable Rate for electricity that is more than *two times* the underlying market rate.

61.     For example, as shown in the chart above, in November 2018, the average wholesale price, including an adder for a renewable energy credit, was $0.0697 per kilowatt hour but Verde charged $0.1599 per kilowatt hour, a premium of 130% more than the wholesale price. The following month, December 2018, the wholesale rate dropped to $0.0621 per kWh, but Verde's rate did not change, resulting in a price that was 157% more than the wholesale price.

62.     Moreover, Verde's costs, other than its wholesale cost of power, were relatively fixed and could not have justified the massive increases alleged above.  For example, charges as ancillary and capacity charges and other regulatory costs did not fluctuate to any material extent and, in particular, did not fluctuate to a material extent in relation to wholesale power prices (these additional costs are included in the "average wholesale rate" in the chart shown in paragraph 56 above).  Verde's other material costs were for operations, and included costs, for example, relating to rent, equipment, overhead, employees, etc. were also relatively fixed and could not justify the price variations alleged above.

63.     Also, the cost that Verde pays for renewable energy certificates to provide "100% renewable" or "green" energy are fixed and insignificant in terms of the overall costs Verde incurs to provide retail electricity.  Therefore, these other cost factors cannot explain the drastic increases in Verde's Variable Rate or the reason its rates are completely disconnected from variation in wholesale costs.  In fact, the average wholesale rate listed above, includes Verde's costs for

renewable energy certificates. Even after adding in these costs, Verde's Variable Rates are still priced at an excessive premium well above the market rate.

64.　　Verde's representation to consumers concerning its Variable pricing plan — that the Variable Rate is market-based — is patently false. Although Verde sometimes *increases* its Variable Rate in response to *rising* wholesale prices, Verde fails to *decrease* its prices in response to a *falling* wholesale market price.

65.　　Notably, Verde charges these exorbitant premiums without adding any value to the consumer whatsoever. As detailed above, Verde neither produces nor transports electricity. It has no role in running or maintaining power plants or power lines; it does not perform hook-ups or emergency responses. Indeed, Verde does not even handle customer billing: that, too, is handled by the local utilities. Essentially, all that Verde does is act as a trader in the transaction. Yet it charges multiple times the amount that the local utilities receive for making electricity and that the local utilities receive for transmitting power, maintaining power lines, handling emergency services, and customer billing and calls.

66.　　The following chart compares Verde's rates to AEP Ohio's rates, which is Plaintiff's EDC. The chart demonstrates that Verde did not provide Plaintiff with either low cost power or a competitive rate—both of which it promised to Plaintiff and other consumers.[10]

| Billing Period[11] | AEP Ohio Rate[12] | Verde Price | Verde Premium ABOVE AEP Ohio Price |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 7/19/2018 | $0.060 | $0.1149 | 90% |
| 8/17/2018 | $0.060 | $0.1149 | 90% |
| 9/18/2018 | $0.060 | $0.1149 | 90% |

---

[10] This chart is only a subset of Plaintiff's most recent billing history leading up to his switch back to AEP in January 2019.
[11] The first day of the period is approximately thirty days before.
[12] The calculation of AEP Ohio's rate includes an adder to account for the cost of renewable energy certificates.

16

| 10/18/2018 | $0.060 | $0.1249 | 107% |
| 11/16/2018 | $0.060 | $0.1599 | 165% |
| 12/19/2018 | $0.060 | $0.1599 | 165% |
| 1/22/2019 | $0.060 | $0.1599 | 165% |

67.     Based on the chart above, from July 2018 to December 2018, AEP's rate, including a renewable energy credit, did not change, whereas Verde's rate *rose* from $0.1149 to $0.1599 in those same months. This price gouging resulted in a 165% overcharge each month from November 2018 until January 2019.

68.     As set forth above, Verde breached its customer contracts as its consumers do not receive a price based on market conditions.  Instead, consumers are charged rates that are substantially higher than those of competitors and untethered to market conditions. Verde intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Plaintiff Abbate—who knows the truth about Verde's exorbitant rates would choose Verde as an electric supplier.

69.     Defendant Verde's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer, including Plaintiff, who knew the truth about Verde's exorbitant rates would choose Verde as an electric supplier, and no reasonable consumer, including Plaintiff, could be expected to uncover the truth until *after* they have paid Verde's exorbitant rates and had the opportunity to *retroactively* compare them to other rates charged during the same time period and in the same location.

70.     Verde knowingly and intentionally made these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be enticed by its false and misleading statements and switch their Electric Supplier and/or Generation Company to Verde.

71.     Verde's only product is electricity delivered by Distribution Companies and has the exact same qualities as electricity supplied by other CRESs or Generation Companies.  There is nothing to differentiate Verde Energy from other CRESs, Distribution Companies, or Generation Companies such that would warrant higher rates, and the potential to pay a reduced rate that is based on market conditions is the only reason Plaintiff and any reasonable consumer would enter into a contract for electricity with Verde.

72.     Verde used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level close to or greater than *two times* the wholesale market rate when the wholesale prices fell.  And Plaintiff's variable rate was consistently higher than his initial rate and often substantially higher than AEP Ohio's and other competing CRESs' rates.

73.     Verde's unfair and deceptive acts and practices, and its misstatements and omissions, caused injury to Plaintiff and other reasonable consumers because they believed that by switching to Verde's electricity plan, they were contracting for a competitive, low-cost Variable Rate tied to the wholesale market rate.

74.     Verde breached its consumer contracts as evidenced by Verde's drastic rate disparities with those of the distribution company and the fact that Verde's rates were considerably higher than AEP Ohio's rates during the time Plaintiff was enrolled in Verde's plan.  Verde does not charge a rate based on market conditions as it states in its solicitations and contracts with consumers, but rather gouges its customers by charging outrageously high rates.

75.     Indeed, Verde's customers are charged Variable Rates that are substantially higher than those of its local competitors, higher than Verde's own initial rate offerings, and uncorrelated to reductions that occur in the wholesale rate – all reasonable and plausible indicators of market

conditions – a term which is undefined in Verde's Terms and Conditions of Service. Verde intentionally fails to disclose this material fact to its customers because no reasonable consumer, including Plaintiff, who knows the truth about Verde's exorbitant rates would choose Verde as an electricity supplier.

76.     Verde knowingly and intentionally made misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be induced to switch to Verde's electricity plan.

77.     Verde knows its rates are unconscionably high, and the misrepresentations it makes about its Variable Rates being market-based were made for the sole purpose of inducing consumers to sign up for Verde's electricity supply. Verde reaps outrageous profits to the direct detriment of Ohio consumers without regard to the consequences high utility bills cause such consumers. As such, Verde acted with actual malice or with wanton and willful disregard for consumers' well-being.

78.     As a direct result of Verde's misrepresentations, Plaintiff and members of the Putative Class overpaid for electricity and therefore suffered common injuries, for which damages can be calculated.

79.     Had Verde charged Plaintiff a rate that was actually based on market conditions, Plaintiff would have been charged a substantially lower rate for his electricity. Accordingly, he was injured when he paid his inflated bills.

E.      **Plaintiff and the Class Suffered Injury Due to Verde's Improper, Unfair and Deceptive Pricing Practices**

80.     Plaintiff Michael Abbate paid Verde's Variable rate from January 2016 through January 2019. During that time, Verde's rates consistently remained significantly higher than the Distribution Company's rates and were uncorrelated with the wholesale market rate. For example,

in December 2018 he paid a variable rate of 15.99 cents per kWh, significantly more than **double** the average wholesale rate and AEP's rate. And as demonstrated above, although Verde sometimes **increases** its Variable Rate in response to **rising** wholesale prices, Verde fails to **decrease** its prices in response to a **falling** wholesale market price.

81.     Verde's conduct, as alleged herein, was improper and it portrayed itself as providing Plaintiff and the Class with an opportunity to purchase low, or lower, energy when, in fact, Verde did the opposite: it charged Plaintiff and the Class more than the underlying wholesale market rates for energy. Verde further engaged in improper practices by claiming it would provide low-cost power and competitive rates that were competitive with the market. As evidenced above, Verde's rates were neither low-cost nor competitive. Verde's rate was significantly higher than, and uncorrelated with, the wholesale market rate. Verde's rate was also significantly higher than AEP Ohio's rates and the rates of other CRESs in the market.

82.     Plaintiff paid Verde's exorbitant variable electricity rates and thereby suffered damages. Verde's conduct as alleged above was a substantial factor in causing Plaintiff's losses, which were a reasonably foreseeable result of that conduct.

83.     Similarly, other members of the Putative Class have routinely paid substantially more for their energy needs since switching to and enrolling in Defendant's electricity plans.

84.     Verde's unfair and deceptive scheme as alleged herein constitutes a continuing violation over the course of each and every time Plaintiff (or any other class member) was overcharged for electricity. Further, Verde actively concealed its wrongful conduct by maintaining to Plaintiff and other members of the Putative Class, through Verde's marketing, invoicing, and other communications directed to consumers, all of which misrepresented that the prices Verde charged for electricity were the result of competitive market forces when, in reality, they were the

result of Verde's fraud. Plaintiff and other members of the Class could not discover through reasonable diligence the nature of Verde's wrongful conduct earlier by virtue of Verde's active concealment of its wrongdoing. Accordingly, all applicable statutes of limitation are tolled and Verde is estopped from asserting any statute of limitation to limit damages.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following Class of similarly situated persons:

> All persons enrolled in a Verde Energy variable rate electric plan in connection with a property located within Ohio at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment (the "Class").

86.     Plaintiff reserves the right to modify or amend the definition of the proposed Class or to propose sub-classes as might be necessary or appropriate.

87.     Excluded from the Class are Defendant, including any parent, subsidiary, affiliate or person controlled by Defendant; Defendant's officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families.

88.     The proposed Class meets all requirements for class certification. The Class satisfies the numerosity standard. The Class is believed to number in the tens of thousands of persons. As a result, joinder of all class members in a single action is impracticable. On information and belief, class members can be identified by Verde and utility company records.

89.     There are questions of fact and law common to the Class which predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Verde's actions include, without limitation, whether Verde:

> a.     committed unfair or deceptive practices by its Variable Rate policies and practices and contract in violation of Ohio Revised Code §1345.01 *et seq.*;
>
> b.     breached its contract with regard to its Variable Rate;

     c.     breached its covenant of good faith and fair dealing with regard to its Variable Rate contracts;

     d.     was unjustly enriched through its Variable Rate policies and practices; and

     e.     continues to commit wrongdoing through its Variable Rate policies and practices.

90.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

91.     Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the members of the Class he seeks to represent.  The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his undersigned counsel, who have extensive experience prosecuting complex class actions.

92.     Plaintiff's claims are typical of the claims of the Class because they arise out of the same conduct, policies, and practices of Verde with respect to its Variable Rate policies and practices.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other putative class member.

93.     Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each class member who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

94.     Notice can be provided to Class members by using techniques and forms of notice similar to those customarily used in other class actions.

## CAUSES OF ACTION

## COUNT I

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**R.C. 1345.01 et seq.**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

96.     Plaintiff brings this Count on behalf of himself and the Class.

97.     Verde is a "supplier" as that term is defined in R.C. § 1345.01(C).

98.     Plaintiff is a "consumer" as that term is defined in R.C. § 1345.01(D).

99.     Plaintiff asserts a claim under the R.C. § 1345.02 which makes it unlawful to engage in any "[u]nfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.02(A)(West).

100.     Plaintiff also asserts a claim under the R.C. § 1345.03 which makes it unlawful to engage in any "unconscionable act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.03(A)(West).

101.     Unfair, deceptive, and unconscionable acts or practices violate the CSPA whether the act occurs before, during, or after the transaction.

102.     Verde is engaged in "Consumer Transactions" as it offers electricity for sale to consumers, including Plaintiff and the Class.  By misrepresenting that its Variable Rates for electricity were competitive market-based rates, Defendant committed unfair methods of

competition and unfair and deceptive acts and practices in connection with a Consumer Transaction.

103.    Under Ohio law, it is a deceptive act for a seller to make any representations "[t]hat a specific price advantage exists, if it does not." Ohio Rev. Code Ann. § 1345.02(B)(8) (West).   It is also a deceptive act for a seller to represent "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have." Ohio Rev. Code Ann. § 1345.02(B)(1) (West).  Defendant's action and omissions described throughout this Complaint violate Ohio Rev. Code Ann. § 1345.02(B)(1) and (8).

104.    Under Ohio law, it is an unconscionable act when the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers.  Ohio Rev. Code Ann. § 1345.03(B)(2) (West). It is also an unconscionable act when the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction. Ohio Rev. Code Ann. § 1345.03(B)(3) (West). And, it is an unconscionable act when the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier. Ohio Rev. Code Ann. § 1345.03(B)(5) (West). Defendant's action and omissions described throughout this Complaint violate Ohio Rev. Code Ann. § 1345.03(B)(2), (3) and (5).

105.    By misrepresenting that its Variable Rates for electricity were "very competitive" market-based rates, Verde made material representations that a specific price advantage existed that it knew, or should have known, did not exist.  Further, by misrepresenting that its Variable Rates for electricity were "very competitive" market-based rates, Verde made material

24

representations that the contract it was offering had benefits that it did not have. And, by misrepresenting that its Variable Rates for electricity were "very competitive" market-based rates, Verde knew that the price paid was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers, knew of the inability of the consumer to receive a substantial benefit from the transaction, and knew the terms were substantially one-sided in its favor.

106. Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the Variable Rates it charges for electricity, as described above and throughout this Complaint, constitute deceptive and unconscionable acts under Ohio Consumer Sales Practices Act. R.C. §§ 1345.02 and 1345.03.

107. Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Defendant.

108. By repeatedly referencing the website www.lowcostpower.com in Verde's Terms of Service, Defendant willfully misrepresented to reasonable consumers that its variable prices for power were "low cost" when in fact they were not.

109. Verde represents on its website that its rates are "competitive" and "competitively priced" with the rates otherwise available in the market. Verde further represents that its energy is "low cost." These representations are deceptive and unconscionable.

110. Indeed, Verde's website address and content knowingly misrepresented to consumers that its pricing was a "competitive" option when it was in fact dramatically higher than and uncorrelated with wholesale prices, and higher than the local distribution company prices and all other CRESs' prices.

111.    Furthermore, Verde knowingly made misrepresentations of material fact by making bald promises of savings, when in fact, Plaintiff did not save money on his energy bills when he switched over from AEP to Verde.

112.    Defendant also affirmatively omitted and failed to inform Plaintiff and the Class that its Variable Rates for electricity are substantially higher than those based on the actual market conditions in the electricity market and do not reflect the wholesale cost of purchasing electricity. That omitted information would have been material to any consumer deciding whether to purchase electricity from Defendant.

113.    Defendant further deceptively and unconscionably misrepresented the most determinative factors it uses to set variable rates.

114.    Defendant knew at the time it promised prospective customers that they would be charged a variable rate based on market conditions that this promise was false.

115.    Defendant made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

116.    Defendant's false, deceptive, and misleading statements and intentional omissions were designed to deceive current and prospective Variable Rate customers into believing that rates will be commensurate with market conditions in the Terms of Service. However, Defendant's rates are not commensurate with market conditions, and instead remain significantly higher than wholesale prices and higher than the local distribution company prices.

117.    Verde's conduct as alleged above constitutes deceptive and unconscionable acts or practices. Verde's Variable electric rate representations as set forth above were and are likely to mislead consumers, and Verde intended that consumers rely upon those representations. Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to

mean that Verde's Variable Rates track the underlying wholesale power rates (when in fact they do not). Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that Verde's Variable Rates were competitive (when in fact they were not). Verde's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from Verde pursuant to variable rate contracts.

118. Defendant's affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract. Rather, Defendant's practices are unconscionable and outside the norm of reasonable business practices. No reasonable consumer would enter into an energy contract in which the CRES is permitted to charge whatever rates it wants. Yet, by deceiving consumers, Verde has managed to convince them to enter into exactly this kind of contract. This is plainly a deceptive and unconscionable result.

119. As a result of Verde's actions and omissions, Plaintiff and the Class suffered injuries because they purchased Defendant's electricity that they otherwise would not have bought or paid more than they would have paid but for Defendant's actions and omissions.

120. The foregoing unfair, deceptive, and unconscionable practices directly, foreseeably, and proximately caused Plaintiff and the Class to suffer an ascertainable loss and substantial injury when they paid an exorbitant premium for electricity over wholesale market rates.

121. Ohio Consumer Sales Practices Act R.C. §1345.09(B) permits any consumer injured by a violation of the act to bring a civil action, including a class action, for damages and injunctive relief. Ohio has a strong interest in applying R.C. §1345.01 et seq. to the conduct at

issue here. Plaintiff resides in, and Defendant advertises, markets, and sells electricity in Ohio to tens-of thousands of Ohio citizens.

122. Defendant's illegal conduct and failures to disclose discussed above constitute an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of O.R.C. § 1345.05. These cases and rules include, but are not limited to: *State ex rel. Petro v. Level Propane Gases*, Inc., PIF No. 10002198 (Ohio C.P. 2003); O.A.C. §109:4-3-02(A)(1); O.A.C. §109:4-3-09*; State ex rel. DeWine v. Thrifty Propane, Inc*., PIF No. 3300 (Ohio C.P. 2019); *In re Sirius XM Radio Inc*., PIF No. 3456 (Ohio AG 2019); *In re Progene Healthcare, Inc*., PIF No. 10003107 (Ohio AG 2013); *State ex rel. Brown v. Silzar, Inc*., PIF No. 10000402 (Ohio C.P. 1982); and O.A.C. §109:4-3-02.

123. As a result of Verde's unlawful business practices, Plaintiff and the members of the Class are entitled, pursuant to Ohio Consumer Sales Practices Act R.C. § 1345.09, to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains.

124. Verde's violation of Chapter Ohio Consumer Sales Practices Act R.C. § 1345.02 was knowing and willful. Defendant's failure to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated Ohio Consumer Sales Practices Act R.C. § 1345.02. Therefore, Plaintiff and each member of the Class are entitled to recover damages and other appropriate relief. Ohio Rev. Code Ann. § 1345.09(B). Plaintiff and the members of the Class are also entitled to attorneys' fees. Ohio Rev. Code Ann. § 1345.09 (F).

## COUNT II

**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

125.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

126.     Plaintiff brings this Count on behalf of himself and the Class.

127.     Plaintiff and the Class entered into a valid contract with Verde for the provision of electricity (the "Agreement").

128.     Pursuant to the Agreement, Verde agreed to charge a Variable Rate for electricity that "may change monthly with market conditions."

129.     Pursuant to the Agreement, Plaintiff and the Class paid the Variable Rates charged by Verde for electricity.

130.     However, Verde failed to perform its obligations under the Agreement because it charged Variable Rates for electricity that were not market-based and instead charged rates significantly higher than and uncorrelated with the wholesale market rate for electricity.

131.     Plaintiff and the Class were damaged as a result because they were billed and paid for, electricity rates that were substantially higher than they would have been had Verde provided a market-based Variable Rate.

132.     By reason of the foregoing, Verde is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial.

<u>COUNT III</u>

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Class)**

133.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

134.     Plaintiff brings this Count on behalf of himself and the Class.

135.     All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff's and Class members' contracts with Verde.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms. Under this covenant, one cannot suppose that one party is put at the mercy of the other but will read in any necessary conditions to ensure a mutuality of obligation under fair terms.

136.     When a contract contains an indefinite price term – such, as here, Defendant's variable, market-based pricing – the seller does not have unfettered discretion to set the price.

137.     Here, Defendant has failed to satisfy this obligation.  Instead of setting its rates in good faith consistent with the market, Defendant has unilaterally imposed exorbitant, undisclosed rates on its customers, including Plaintiff and the Class.  In actuality, Defendant's rates bear no reasonable relationship to market rates.  While Defendant represents that its Variable Rates may change monthly according to market conditions, its rates will be low-cost and competitive with the market at large (as represented by the distribution companies – Verde's main competitors), in reality, Verde's rates generally far exceed that market.

138.     Under the covenant of good faith and fair dealing, Verde should have billed customers like Plaintiff at a reasonable, market-based rate as promised.  All monies paid above this reasonable amount should be restored to Plaintiff and the Class as damages.

139.     Verde breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff's and the Class members' reasonable expectations that the Variable Rate for electricity would be commensurate with market conditions.

140.     Verde's performance of its discretionary functions under the Terms of Service, as alleged herein to maximize its revenue from variable electric rates, impedes the right of Plaintiff and the Class to receive benefits that they reasonably expected to receive under the contract.

141.     Verde acted in bad faith by abusing its discretion and purposefully hiding that its Variable Rates would never be based on market conditions – vital information that is material to the Plaintiff's and the Class Members' decisions to enroll in and remain enrolled in Verde's plans – to ensure that the Plaintiff and Class Members continued to perform under the contract even though Defendant knew its Variable Rates would never be based on the agreed upon market conditions.

142.     In fact, Verde's rates varied from the competition significantly and did not react to other indicators of market conditions.   As such, Verde charged Plaintiff and the Class commercially unreasonable rates and in doing so acted in bad faith or with improve motive.

143.     Plaintiff and the Class have been damaged by Verde's breach of the covenant of good faith in an amount to be determined at the trial of this action.


**COUNT IV**

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class,**
**In the Alternative to Count II)**

144.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

145.     Plaintiff brings this Count on behalf of himself and the Class.

146.     If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment in that alternative on behalf of himself and the Class.

147.     Verde has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.

148.     Verde has been enriched by a benefit in the form of payment of exorbitant Variable Rates.

149.     Verde's enrichment was at the expense of Plaintiff and the Class.

150.     It would be unjust to allow Verde to retain these benefits.

151.     Plaintiff and the Class are entitled to disgorgement and restitution of all wrongfully obtained gains received by Verde as a result of its wrongful conduct alleged herein.

152.     Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

A.     Certifying this matter as a class action for money damages pursuant to Fed. R. Civ. P. 23(b)(3);

B.     Appointing Plaintiff as class representative, and appointing Plaintiff's attorneys as class counsel;

C.     Awarding compensatory and punitive damages in favor of Plaintiff and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing in an amount to be determined at trial;

D.     Awarding Plaintiff and the Class actual damages, compensatory damages and punitive damages, as appropriate, pursuant to the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq.*,

E.     Awarding Plaintiff and the Class their reasonable attorneys' fees and costs pursuant to the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq.*;

F.     Awarding pre-judgment and post-judgment interest and costs of suit; and

G.     Awarding any and all other relief that this Court may deem to be just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: June 24, 2020                                    Respectfully Submitted,


*/s/Jeffrey S. Goldenberg*
Jeffrey S. Goldenberg (0063771)
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Telephone: (513) 345-8297
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com

Jonathan Shub*
Kevin Laukaitis*
**Shub Law Firm, LLC**
134 Kings Hwy. E.
2nd Floor
Haddonfield, New Jersey 08033
Telephone: 856-772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

Gregory F. Coleman*
Lisa A. White*
**Greg Coleman Law PC**
First Tennessee Plaza

800 S. Gay Street
Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090
Facsimile: (865) 522-0049
greg@gregcolemanlaw.com
Lisa@gregcolemanlaw.com

Daniel K. Bryson*
Harper T. Segui*
**Whitfield Bryson, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Dan@whitfieldbryson.com
harper@whitfieldbryson.com

\* *Pro Hac Vice* Application forthcoming

*Attorneys for Plaintiff and the Class*